JACQUELINE JARRETT, Plaintiff-Appellant, *v.* WALTER JARRETT, Defendant-Appellee.

First District (3rd Division)   No. 77-1321

Opinion filed September 13, 1978.—Rehearing denied November 1, 1978.

SIMON, J., specially concurring.
McNAMARA, J., dissenting.

Michael W. Verzatt, of Chicago, for appellant.

Lois Solomon and Arthur M. Solomon, both of Chicago, for appellee.

Mr. PRESIDING JUSTICE JIGANTI delivered the opinion of the court:

This is an appeal by the plaintiff, Jacqueline Jarrett, from an order of the trial court awarding a change of custody to the defendant, Walter Jarrett, pursuant to his petition. The issue presented for review is whether there was a change of circumstances detrimentally affecting the welfare of the minor children which warranted a change of custody.

On December 6, 1976, the plaintiff was awarded a judgment for divorce on the grounds of extreme and repeated mental cruelty. Pursuant to the judgment order and property settlement agreement, the plaintiff, having been found to be a fit and proper person, was granted sole care, custody, control and education of the three daughters of the couple, then aged 12, 10 and 7. The defendant was granted visitation rights "at all reasonable times."

In April 1977, Jacqueline informed Walter that Wayne Hammon would be moving into the family home where she and the children lived. Walter protested this arrangement, but Hammon moved into the residence on May 1, 1977.

Walter subsequently filed a petition for change of custody, and, on July 12, 1977, a post-decree hearing was held. At the hearing, testimony showed that since the divorce, Walter had visited with the children every weekend, usually picking them up every Saturday evening, taking them to church, and then preparing their dinner. The girls would stay overnight and spend all day Sunday with him, returning home at about 5 p.m. The children are being raised in the Roman Catholic religion, and Jacqueline takes the children to religious instruction on Saturdays.

Walter testified that Jacqueline's living arrangement was contrary to his own personal beliefs and that he would not want his children to be raised in that atmosphere. He stated that he believed it was an improper moral climate and that he had certain ideals which he would like to be able to instill in his children. He further testified that when he picks the children up at Jacqueline's home every weekend, they have always been clean, healthy, well dressed and well nourished. He stated that he had spoken with his oldest daughter, Kathleen, about Hammon and the living arrangement, and she expressed no serious objections, except that occasionally he would yell at them when they made noise or something of that nature.

Wayne Hammon testified that the children refer to him as Wayne, and that he disciplines the children verbally from time to time. He and Jacqueline had discussed their situation with the children from time to time in terms of different people having different beliefs and that their father felt one way about it while they felt another, and that what mattered was that they loved each other. Hammon was acquainted with the neighbors, and had attended school functions with the children. He and the children had fun together and seemed to get along. He paid the children their allowances out of his money.

Jacqueline Jarrett testified that the children have lived in the present family home in Mount Prospect all their lives. She and her neighbor alternate driving her oldest daughter to school before 8:30, when Jacqueline leaves for work. The two younger girls, who do not have to be in school until 9 o'clock, can walk to school without having to cross a street. When the children are not in school, she has a part-time sitter who stays with the children until Hammon gets home. The children are very fond of Hammon and show him affection, although when they first learned that he would be moving in, they were not "overly enthused about it." They asked if they were going to get married, and Jacqueline told them she did not know. She explained to the children that some people think it is wrong for two people to live together without a marriage license, but that such was not her feeling. She testified that she did not want to get married at that time because it was too soon after the divorce, that she did not believe a marriage license "makes a relationship," that the divorce judgment provides that upon remarriage she must sell the house within six months and the children did not want to move, and that she could not afford it on her present salary. Hammon helps the children with their homework, and they go to shows, play games and participate in other activities as a family unit. Jacqueline stated that the love she and Hammon feel for each other very definitely manifested itself to the children and that her children were developing their own sets of values as individuals and not as duplicates of herself.

The trial court granted the defendant's petition, stating that it was "necessary for the moral and spiritual well-being and development" of the children that they reside with the defendant rather than the plaintiff and on July 19, 1977, the amended judgment order was entered granting Walter custody of the three children. Jacqueline's petition for a rehearing and motion for a stay pending appeal were denied. The sole issue presented for review is whether the fact that an unmarried male moved into the family residence with Jacqueline and her children constituted a change of circumstances which so detrimentally affected the welfare of the children that it was in their best interests to require a change in custody.

■■■ It is well settled in Illinois that a judgment for divorce cannot be modified or amended unless there has been a material change of circumstances since its entry. (*Jacobs v. Jacobs* (1974), 25 Ill. App. 3d 175, 177, 323 N.E.2d 21, *Taylor v. Taylor* (1961), 32 Ill. App. 2d 45, 48, 176 N.E.2d 640.) Every presumption is indulged in favor of the validity of the judgment, and if its provisions are to be changed, the burden of proof is on the moving party to show why the change should be made. (*Jacobs*, at 170; *Eggemeyer v. Eggemeyer* (1967), 86 Ill. App. 2d 224, 230, 229 N.E.2d 144; *Abbott v. Abbott* (1976), 40 Ill. App. 3d 348, 350, 352 N.E.2d 404.) The evidence must establish that the parent to whom custody of the children was originally awarded is unfit to retain custody or that a change of conditions makes a change of custody in their best interests. *Vanderlaan v. Vanderlaan* (1972), 9 Ill. App. 3d 260, 264, 292 N.E.2d 145; *Stickler v. Stickler* (1962), 38 Ill. App. 2d 191, 186 N.E.2d 542.

In all matters concerning the custody of children, the paramount issue is their welfare. The fact of changed conditions, in itself, is not sufficient to warrant modification of the custody provisions of the decree absent a finding that such changed conditions affect the welfare of the children. (*Eggemeyer*, at 231; *Jacobs*, at 178; *Arden v. Arden* (1960), 25 Ill. App. 2d 181, 186, 166 N.E. 2d 111; *Garland v. Garland* (1974), 19 Ill. App. 3d 951, 954, 312 N.E.2d 811.)

> " 'In determining whether there have been changed conditions the court must keep in view primarily the welfare of the child. The custody of the child is not awarded for the purpose of gratifying the feelings of either parent or with any idea of punishing or rewarding either parent.' *Hamilton v. Anderson*, 176 Ark. 76, 2 S.W.(2d) 673." *Maupin v. Maupin* (1950), 339 Ill. App. 484, 489, 90 N.E.2d 234; *Wade v. Wade* (1951), 345 Ill. App. 170, 180, 102 N.E.2d 356; *Arden*, at 186.

While the trial court has broad discretion in such cases, such discretion is not unlimited but is subject to review and will be reversed if exercised in a manner contrary to the manifest weight of the evidence. (*Eaton v.*

*Eaton* (1977), 50 Ill. App. 3d 306, 310, 365 N.E.2d 647; *Comiskey v. Comiskey* (1977), 48 Ill. App. 3d 17, 24, 366 N.E.2d 87.) Since the children and the parents are entitled to a certain degree of finality and conclusiveness when an order of custody is entered (*Collings v. Collings* (1970), 120 Ill. App. 2d 125, 128, 256 N.E.2d 108), the person seeking a change of custody must positively demonstrate that the change is necessary for the welfare of the children. *King v. Vancil* (1975), 34 Ill. App. 3d 831, 834, 836, 341 N.E.2d 65.

The original judgment order found Jacqueline to be a fit and proper person to have sole responsibility for the care, custody, control and education of the children. Such an award must be viewed as embracing all the ramifications of those terms, including the development of a person by fostering to varying degrees the growth or expansion of knowledge, wisdom, desirable qualities of mind or character, physical health, or general competence. Evidence in the instant case raised no question of Jacqueline's fitness as a good mother who properly cared for the physical and emotional needs of her daughters. The question raised by the defendant is whether her open relationship with Hammon constitutes such a disregard for community standards as to endanger her children's moral well-being.

The defendant points out that the new Illinois Marriage and Dissolution of Marriage Act (Ill. Rev. Stat. 1977, ch. 40, par. 610(3)) provides that a custody judgment can be modified where "the child's present environment endangers seriously his * * * moral or emotional health and the harm likely to be caused by a change of environment is outweighed by its advantages to him." However, the courts of this State have often allowed women whose behavior society may have considered to be questionable to retain custody of their children or have refused to change custody in the absence of any evidence that the "imprudence" was detrimental to the child's welfare. See *Eaton v. Eaton* (1977), 50 Ill. App. 3d 306, 365 N.E.2d 647; *Hendrickson v. Hendrickson* (1977), 49 Ill. App. 3d 160, 364 N.E.2d 566; *Christensen v. Christensen* (1975), 31 Ill. App. 3d 1041, 335 N.E.2d 581; *Van Buskirk v. Van Buskirk* (1974), 19 Ill. App. 3d 647, 312 N.E.2d 395; *Collings v. Collings* (1970), 120 Ill. App. 2d 125, 256 N.E.2d 108; *Arden v. Arden* (1960), 25 Ill. App. 2d 181, 166 N.E.2d 111; *Brown v. Brown* (1957), 13 Ill. App. 2d 56, 140 N.E.2d 528; *Nye v. Nye* (1952), 411 Ill. 408, 105 N.E.2d 300.

We also note that the Illinois Marriage and Dissolution of Marriage Act provides that in determining custody in accordance with the best interests of the child, "[t]he court shall not consider conduct of a present or proposed custodian that does not affect his relationship to the child." (Ill. Rev. Stat. 1977, ch. 40, par. 602(b).) By statutory mandate, it is not our function to approve or disapprove Jacqueline's conduct, but only to determine its effect upon the children.

In the case at bar, it has neither been contended nor proved that Jacqueline was not a kind, affectionate mother; neither has it been shown that she neglected her children in any way. No fault was found or disclosed as to the appearance, health, or stability of the children or of the condition of the home. The schooling and religious training of the girls was being attended to by Jacqueline, who took them to religious classes every Saturday morning as well as by their weekly attendance at church with their father. It is evident that Jacqueline Jarrett, Wayne Hammon, and the three Jarrett children function as a family unit. Hammon disciplines the children, helps them with their homework, plays with them. There was no noticeable disruption of the children's routine by Hammon's entry into their lives, nor were they subject to the vagaries of an unstable relationship, shuttled back and forth between residences, or given cause to suspect that anything of an improper nature was transpiring. There was no evidence of any feelings of guilt or fears aroused in the children. Jacqueline and Hammon were open in their feelings for each other, open in their relationship to the children and to their community. From the evidence in the record before us, they are mature adults and their relationship is not relevant here unless it is shown as having a negative effect on the children. (*Hendrickson v. Hendrickson* (1977), 49 Ill. App. 3d 160, 163, 364 N.E.2d 566.) In the absence of any evidence of such negative effects, we decline to indulge in speculation as to what effects might possibly "raise their ugly heads" at some future time (*Gehn v. Gehn* (1977), 51 Ill. App. 3d 946, 949, 367 N.E.2d 508).

■■ There was neither a specific finding of Jacqueline's unfitness nor evidence which would support that conclusion. Similarly we see no evidence to warrant the conclusion that a change of custody was necessary to serve the best interests of the children. We do find it to be an abuse of discretion for the trial court to impose its own standard in this regard and infer, without any evidence in the record, that Jacqueline's conduct in living with a man to whom she was not married was detrimental to the welfare of the children and in and of itself sufficient to disqualify her as the custodian of the children. Accord, *In re Marriage of Moore* (1975), 35 Colo. App. 280, 531 P.2d 995.

For the foregoing reasons, the judgment of the circuit court of Cook County is reversed.

Reversed.

Mr. JUSTICE SIMON, specially concurring:

I concur fully in the court's opinion. In addition, I think it relevant to point out a circumstance which came to our attention during oral argument, indicating that the change of custody was unrealistic and likely to have been based more on the trial judge's adverse reaction to the living

arrangements of Jacqueline and Wayne—neither of whom was married— than on consideration of the best interest of the children. After custody was transferred from Jacqueline to Walter, the children lived with Walter during the week but spent weekends at their mother's home. Thus, the children continued to be exposed to the same relationship between Jacqueline and Wayne that prompted the trial judge to grant a change of custody.

Whether right or wrong, it appears to be more and more common for a person, including a divorced parent, to live with one of the opposite sex without marriage. Prosecution by legal authority in such a situation today is extremely unusual. Realistically, if a divorced parent chooses to enter into such a living arrangement, there is no way to insulate his or her children from knowledge of and exposure to the relationship the parent is maintaining, unless, perhaps, a court is willing to go to the extreme and unusual length of terminating the parent's visitation privileges. No one in this case has even suggested such a drastic and cruel approach. Here, living with their mother and Wayne on a permanent basis could not affect the children appreciably differently than spending weekends with their mother and Wayne after their custody was changed. In either case the children were fully exposed to their mother's relationship with Wayne and, therefore, that relationship in itself did not warrant a change in custody.

Mr. JUSTICE McNAMARA, dissenting:

The majority opinion finds that the wife is openly living with a man to whom she is not married, but holds that the trial court abused its discretion in concluding that such criminal conduct on her part constituted a material change of circumstances detrimentally affecting the welfare of the children and warranting a change in their custody. I rather think that the trial court would have committed manifest error if it had overlooked the wife's criminal conduct and had not placed the children in the custody of the father.

In *Hahn v. Hahn* (1966), 69 Ill. App. 2d 302, 216 N.E.2d 229, the trial court transferred custody of the minor children from the wife to the husband because the wife had begun living in open adultery with a married man. The trial court took this action despite the fact that at about the time the petition for change of custody was filed, the married man had moved to Wisconsin. In affirming the trial court's action, this court stated at page 305:

> "While the trial court found in this case that the evidence showed no sign of lack of affection nor was there evidence of physical neglect, certainly Dale's [the wife's] conduct cannot be considered conducive to the proper moral training that children of tender

years need. We agree with the trial court that the record here is void of evidence that would give any assurance that Dale intended to abandon her ways. In matters concerning the custody of infant children the court will not disturb the determination of the trial judge who has heard the evidence and has had an opportunity to observe the parties, unless it appears manifest injustice has been done." *Rodely v. Rodely* (1963), 28 Ill. 2d 347, 350, 192 N.E.2d 347.

In *Gehn v. Gehn* (1977), 51 Ill. App. 3d 946, 367 N.E.2d 508, the trial court transferred the custody of five minor children from the wife to the husband on the ground that the wife "became deeply involved in an affair with her boyfriend who was separated but still married to his wife." This court affirmed the change of custody, stating at page 949:

"The record in this case supports a finding that the plaintiff had no qualms in exposing and exhibiting to her children her illicit relationship with her boyfriend. The plaintiff admits her immoral conduct, but argues that no testimony was presented which would show that her conduct had any ill effects upon the children. It might be not only difficult but impossible to present evidence showing objective effects that such conduct would have on minor children. The effects may well be subjective ones that will raise their ugly heads and make their presence known at some future time. Certainly the conduct of the plaintiff cannot be regarded as good and wholesome moral training. We further note that the plaintiff utterly failed to display any degree of penitence as far as her conduct was concerned, but on the contrary assured the court that if she continued to have custody of the children she would persist in the overnight sojourns to her boyfriend's house with her five children." 51 Ill. App. 3d 946, 949.

The majority dismiss the *Gehn* holding by stating that they decline to engage in speculation as to what effect plaintiff's conduct in the present case will have on her children in the future. While I do not agree that the *Gehn* court was engaged in speculation, the present record clearly reveals that the trial court was justified in transferring custody. The wife testified that she had explained to the children that she believed there was nothing wrong about her conduct and further testified that she was permitting the children to develop their own set of values. When a mother teaches children that her own criminal conduct is proper, it is unlikely that she will be able to proscribe any future illegal activities of the children. The trial court correctly found a material change of circumstances affecting the welfare of the children. It properly transferred custody of the children to the husband. The trial court's holding was not contrary to the manifest weight of the evidence, and I believe it should be affirmed.